# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KODIAK BUILDING PARTNERS, LLC, )
)
Plaintiff, )
)
v. )   C.A. No. 2022-0311-MTZ
)
PHILIP D. ADAMS, )
)
Defendant. )

## MEMORANDUM OPINION

Date Submitted: September 26, 2022
Date Decided: October 6, 2022

Steven J. Fineman, Travis S. Hunter, Alexandra M. Ewing, Dorronda R. Bordley, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Plaintiff Kodiak Building Partners, LLC*.

Andrew L. Cole, Michael E. Fitzpatrick, COLE SCHOTZ P.C., Wilmington, Delaware; Brian P. Matthews, COLE SCHOTZ P.C., Hackensack, New Jersey, *Attorneys for Defendant Philip D. Adams*.

**ZURN, Vice Chancellor.**

The plaintiff in this matter seeks to enforce a restrictive covenant agreement against the defendant, its former employee. The plaintiff's business model is purchasing and then operating smaller companies in the construction industry; to date, the plaintiff has acquired companies that produce roof trusses and lumber, drywall, steel construction supplies, and kitchen interiors. The defendant is a former employee and stockholder of a roof truss company the plaintiff acquired. In conjunction with the acquisition, the plaintiff entered into a restrictive covenant agreement with each target stockholder. The restrictive covenant agreement included noncompetition, nonsolicitation, and confidentiality covenants. It also included provisions purporting to waive the target stockholders' rights to contest the reasonableness of the restrictive covenants.

A few months after the acquisition, the defendant resigned and began work at a different nearby roof truss and lumber business. The plaintiff sued the defendant for breach of the restrictive covenant agreement, and sought a preliminary injunction.

For the reasons explained below, I conclude the restrictive covenant agreement's waiver provision does not preclude this Court from reviewing the restrictive covenants for reasonableness; the restrictive covenants protecting all the plaintiff's business lines are unenforceable because they are broader than the plaintiff's legitimate business interest in the purchased assets; and the alleged

1

breaches of other provisions of the agreement do not support injunctive relief. The plaintiff's motion for a preliminary injunction is denied.

## I. BACKGROUND[1]

For nearly seventeen years, Defendant Philip D. Adams was a general manager of a truss manufacturer, Northwest Building Components, Inc. ("Northwest"), a Washington corporation.[2] Northwest has a single location in Rathdrum, Idaho, at which it "manufacture[s] and sell[s] and deliver[s] roof trusses and other building materials, mostly lumber-based building products," including "anything that could go with a truss or a framing package and new construction."[3]

---

[1] I draw the following facts from the Verified Amended Complaint For Injunctive Relief, the documents attached and integral to it, and all evidence currently in the record. Docket Item ("D.I.") 90 [hereinafter "Am. Compl."]. *See, e.g.*, *AffiniPay, LLC v. West*, 2021 WL 4262225, at *1 (Del. Ch. Sept. 17, 2021); *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998). Citations in the form of "OB —" refer to Plaintiff's Opening Brief in Support of Its Motion for a Preliminary Injunction, available at D.I. 83. Citations in the form of "AB —" refer to Defendant's Answering Brief in Opposition to Plaintiff's Motion Seeking a Preliminary Injunction, available at D.I. 92. Citations in the form of "RB —" refer to Plaintiff's Reply Brief in Support of Its Motion for a Preliminary Injunction, available at D.I. 98.

Adams was deposed. OB Ex. 2, Deposition Transcript of Philip D. Adams [hereinafter "Adams Dep."]. He also filed an affidavit in support of his answering brief. D.I. 92. Except on routine or undisputed matters, I have discounted Adams's affidavit and relied on the deposition testimony and contemporaneous documents. *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 819 & n.1 (Del. Ch. 2011) (citing *In re W. Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *19 (Del. Ch. May 22, 2000), and *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000), and *Chesapeake Corp. v. Shore*, 771 A.2d 293, 302 & n.7 (Del. Ch. 2000)).

[2] Adams Dep. 32–33; OB Ex. 1 at KODIAK_00001326 [hereinafter "SPA"].

[3] Adams Dep. 36; OB Ex. 6, Deposition Transcript of Jeffrey Smith on Behalf of Kodiak Building Partners, LLC at 5–6 [hereinafter "Kodiak Dep."].

It does not supply lumber.[4] Adams's duties as general manager included overseeing the day-to-day operations and "the overall performance of the business unit," such as scheduling and handling certain customer accounts.[5] Adams reported to Northwest's president, who primarily handled purchasing equipment and business expansion.[6] He earned approximately $84,000 in annual base compensation plus an approximately $45,000 bonus.[7] Northwest's customers are primarily located "within 30 to 60 minutes of [its] location."[8]

Plaintiff Kodiak Building Partners, LLC ("Kodiak") is a Delaware limited liability company.[9] Over the course of several years, Kodiak has acquired at least nineteen wholly-owned subsidiaries around the country through which it operates four business lines: (i) lumber and building materials, which may or may not include roof trusses, depending on the location; (ii) gypsum, which includes drywall, steel studs, and related supplies; (iii) construction supplies, which are primarily steel,

---

[4] Adams Dep. 206.

[5] *Id.* at 33–34; OB Ex 4, Deposition Transcript of Gregg Leslie, at 50 [hereinafter "Leslie Dep."].

[6] Adams Dep. 35–38.

[7] *Id.* at 361–62.

[8] Kodiak Dep. 7.

[9] SPA at KODIAK_00001326.

rebar, and structural steel; and (iv) kitchen interiors, which is primarily kitchen appliances, and some flooring, cabinets, and countertops.[10]

On June 1, 2020 (the "Closing"), Kodiak entered into a stock purchase agreement (the "SPA") with Northwest and Mandere Construction, Inc. ("MCI") (the "Acquisition").[11] MCI is an Idaho corporation that sells, manufactures, and delivers roof trusses.[12] Through the Acquisition, Kodiak acquired Northwest and MCI's "Company Capital Stock" and "all of the assets, properties, rights, licenses, interests, Customer Deposits, Contracts and business, of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, held or used by [Northwest or MCI] or in the conduct of [Northwest or MCI's] business (the 'Purchased Assets')."[13] The Purchased Assets included Northwest's goodwill and Adams's 8.33% interest in Northwest.[14]

---

[10] AB Ex. 2, Plaintiff's Second Supplemental Responses and Objections to Defendant's Expedited Interrogatories and Requests for Production of Documents, at Responses and Supplemental Responses #3, #26 [hereinafter "Kodiak's Second Supplemental Discovery Responses"] (listing nineteen different business entities, and their aliases and locations, as applicable); Kodiak Dep. 20–24; *see also id.* at 18–20, 39 (describing Kodiak's corporate structure as it pertains to the "Company Group").

[11] *See generally* SPA.

[12] Kodiak's Second Supplemental Discovery Responses at Response #3; Kodiak Dep. 20 (comparing MCI's business to Northwest's); Leslie Dep. 18–19 (describing MCI's relationship to Northwest as "horizontal integration").

[13] SPA § 2.01.

[14] Kodiak Dep. 50–51; Adams Dep. 45.

In connection with the Acquisition, Kodiak entered into a restrictive covenant agreement ("RCA") with Adams and the three other Northwest stockholders, including MCI's sole owner, from whom Kodiak purchased Northwest and MCI.[15] The RCA includes the following restrictive covenants: "Non-Competition"; "Non-Solicitation"; "Confidentiality"; "Non-Interference"; and "Non-Disparagement."[16] The RCA applies to Adams "for a period of 30 months" from the Closing.[17] The RCA also includes language providing that Adams acknowledged the reasonableness and necessity of the restrictive covenants, and that he waived any issue of reasonableness as a defense.[18]

On October 11, 2021, Adams resigned from Northwest.[19] On December 27, Adams joined Builders FirstSource, Inc. ("BFS") as its general manager.[20] His first day was January 11, 2022.[21] BFS supplies building materials such as lumber, roof

---

[15] OB Ex. 7 at Preamble [hereinafter "RCA"] (defining "Covered Parties" as Adams, John Mandere, Matthew M. Johnson, and Greggory O. Leslie); SPA at KODIAK_00001326 (defining "Sellers" as Adams, John Mandere, Matthew M. Johnson, and Greggory O. Leslie); Leslie Dep. 17, 21, 50 (testifying Northwest and MCI were both Mandere's companies and Leslie, Adams, Johnson, and Mandere were each Northwest stockholders who sold to Kodiak); OB Ex 5, Deposition Transcript of Matthew Johnson, at 15–17, 23, 28, 32 (same).

[16] RCA §§ 1–5.

[17] *Id.* § 1.

[18] *Id.* §§ 6, 8.

[19] Am. Compl. ¶ 24; Adams Dep. 49, 211.

[20] Adams Dep. 175–76, 203; OB Ex. 24 at BFS_000006.

[21] Adams Dep. 176.

trusses, and I-joists, and provides design services for roof trusses.[22]  BFS has two facilities in Spokane, Washington; the location at which Adams works is approximately twenty-four miles away from Northwest.[23]  Its truss business is national.[24]  On March 17, Northwest (by then a Kodiak affiliate) learned that it "lost [a] job to Phil [Adams]."[25]  Later that same day, Kodiak and Northwest caused their counsel to send cease-and-desist letters to BFS and Adams "remind[ing] [Adams] of [his] obligations under the [RCA]."[26]

On April 5, Kodiak filed its Verified Complaint for Injunctive Relief (the "Complaint").[27]  Kodiak also moved for a preliminary injunction and expedited proceedings.[28]  On April 27, Adams moved to dismiss the Complaint or to stay the case.[29]  On July 6, I denied Adams's motion to dismiss.[30]  On July 18, Adams

---

[22] *Id.* at 65, 205–06.

[23] *Id.* at 65, 67.

[24] *Id.* at 65.

[25] OB Ex. 36 at KODIAK_00000031; Am. Compl. ¶¶ 34–35.

[26] OB Ex. 38 at ADAMS0000419; Am. Compl. ¶ 37.

[27] D.I. 1.

[28] D.I. 2; D.I. 3.

[29] D.I. 15; D.I. 16.

[30] D.I. 38.

answered the Complaint.[31]  The parties then briefed Kodiak's motion for preliminary injunction (the "Motion").[32]

While the parties were briefing the Motion, Kodiak filed a Verified Amended Complaint for Injunctive Relief (the "Amended Complaint"), and Adams answered.[33]  Counts I and II respectively allege Adams breached RCA Section 1, the noncompete covenant, and Section 2, the nonsolicitation covenant.[34]  Kodiak seeks injunctive relief in connection with Counts I and II.[35]  Count III alleges Adams breached RCA Section 9 by failing to give Kodiak notice that he undertook new material business activity related to the "Business."[36]  Count IV alleges Adams generally breached the RCA.[37]  Kodiak seeks damages in an amount to be determined at trial in connection with Counts III and IV.[38]  On September 26, I heard argument on the Motion.[39]

---

[31] D.I. 43.

[32] OB; AB; RB.

[33] Am. Compl.; D.I. 97; D.I. 100 [hereinafter "Am. Ans."].

[34] Am. Compl. ¶¶ 40–56.

[35] *Id.* ¶¶ 48, 56.

[36] *Id.* ¶¶ 57–62.

[37] *Id.* ¶¶ 63–67.

[38] *Id.* ¶¶ 62, 67.

[39] D.I. 101.

## II. ANALYSIS

"This Court has broad discretion to grant or deny a preliminary injunction."[40] To obtain a preliminary injunction, the movant must demonstrate: (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction.[41] But a preliminary injunction "is not granted lightly," and "the moving party bears a considerable burden in establishing each of these necessary elements. Nevertheless, while some showing is required as to each element, there is no steadfast formula for the relative weight each of these three factors deserves."[42]

### A. Kodiak Has Not Shown That It Has A Reasonable Likelihood Of Success On The Merits On Counts I And II Because RCA Sections 1 And 2 Are Unenforceable.

A party showing a "reasonable probability" of success must demonstrate that it will prove by a preponderance of the evidence that "it is more likely than not

---

[40] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010) (citing *Data Gen. Corp. v. Digit. Comput. Controls, Inc.,* 297 A.2d 437, 439 (Del. 1972)).

[41] *Pell v. Kill*, 135 A.3d 764, 783 (Del. Ch. 2016) (citing *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986)).

[42] *Fletcher Int'l*, 2010 WL 1223782, at *3 (alterations and internal quotation marks omitted) (quoting *La. Mun. Police Empls.' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1185 (Del. Ch. 2007), and *Alpha Builders, Inc. v. Sullivan,* 2004 WL 2694917, at *3 (Del. Ch. Nov. 5, 2004)).

entitled to relief."[43]  Here, Kodiak must demonstrate Adams has more likely than not breached an enforceable restrictive covenant.  Delaware courts do not mechanically enforce noncompetition or nonsolicitation agreements.[44]  "[A]greements not to compete must be closely scrutinized as restrictive of trade."[45]  Delaware courts "carefully review" noncompete and nonsolicit provisions to ensure that they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities."[46]  "Delaware courts have favored the public interest of competition in their review of noncompetition agreements."[47]  Generally, covenants not to compete in the context of a business sale are subject to a "less searching" inquiry than if the covenant "had been contained in an employment contract."[48]  Where

---

[43] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.*, 107 A.3d 1049, 1067 (Del. 2014) (internal quotation marks omitted) (quoting *Mitchell Lane Publ'rs, Inc., v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. 2014)); *Cantor Fitzgerald*, 724 A.2d at 579.

[44] *E.g.*, *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) (citing *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987)).

[45] *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977).

[46] *FP UC Hldgs.*, 2020 WL 1492783, at *6 (internal quotation marks omitted) (quoting *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018)).

[47] *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2005) (citing *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *15 (Del. Ch. Apr. 15, 2004)).

[48] *Tristate Courier*, 2004 WL 835886, at *10.

noncompete or nonsolicit covenants are unreasonable in part, Delaware courts are hesitant to "blue pencil" such agreements to make them reasonable.[49]

The RCA's language stating its restrictive covenants are reasonable, and waiving a defense that they are not, does not preclude this Court from performing the reasonableness analysis our law mandates. Kodiak cannot rely on those provisions to evade review and establish a reasonable probability of success on the merits. After analyzing the contract's reasonableness under the common law test, I

---

[49] Kodiak asserts that "this Court is free under Delaware law to blue pencil the [RCA] as it deems appropriate." RB at 15 n.8 (citing *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at * 3 (Del. Ch. Mar. 5, 1998), and RCA § 10 (consenting that the RCA "may be judicially reformed, revised, modified, or partially enforced in any proceeding brought by [Kodiak] to enforce [the RCA]"). "While, in some circumstances, a court may use its discretion to blue pencil an overly broad non-compete to make its restrictions more reasonable, this court has also exercised its discretion in equity not to allow an employer to 'back away from an overly broad covenant by proposing to enforce it to a lesser extent than written.'" *FP UC Hldgs.*, 2020 WL 1492783, at *8 (footnotes omitted) (citing *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969), and then quoting *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *10 (Del. Ch. Mar. 16, 2011)); *see Del. Elevator*, 2011 WL 1005181, at *11 (explaining that disparate bargaining power between employers and employees "lead[s] [the Court] to conclude that when a restrictive covenant is unreasonable, the [C]ourt should strike the provision in its entirety" instead of blue penciling restrictive covenants to create a "no-lose" situation for employers (citations omitted)); *see also* Charles A. Sullivan, *The Puzzling Persistence of Unenforceable Contract Terms,* 70 Ohio St. L.J. 1127, 1151 (2009) ("[I]t seems likely that many [overbroad non-compete agreements], perhaps most, reflect the incentives the law has created for employers: ask for as much as possible, with the expectation that you will get at least what you're entitled to should the matter go to court."); Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 689–94 (2008) (arguing courts' willingness to modify non-competes creates confusion, encourages employers to overreach, and encourages litigation "by building a degree of uncertainty into every employment agreement"); *cf. C & J Energy*, 107 A.3d at 1054 ("To blue-pencil a contract . . . is not an appropriate exercise of equitable authority in a preliminary injunction order.").

10

find the RCA's restrictive covenants in Sections 1 and 2 are unreasonable, and consequently unenforceable. Accordingly, Kodiak has failed to demonstrate a reasonable likelihood of success on the merits of Counts I and II.

**1.      RCA Section 6's Stipulation And Section 8's Waiver Are Against Public Policy.**

I first address Kodiak's assertion that the parties contracted to entirely avoid this Court's evaluation of the RCA's reasonableness. The RCA contains two provisions, Sections 6 and 8, that purport to waive Adams's ability to challenge the reasonableness of the covenants:

> Remedies. Each Covered Party acknowledges it has carefully read and considered all terms and conditions of this Agreement, including the restraints contained in Sections 1 through 5, and agrees without reservation that each restraint contained in this Agreement is necessary for the reasonable and proper protection of the goodwill, Confidential Information, trade secrets and other legitimate interests of [Kodiak], other members of the Company Group and the Business; and that each and every one of the restraints is reasonable in respect to subject matter, length of time, scope of activity and geographic area . . . .
> . . .

11

> Reasonableness. Each Covered Party expressly acknowledges that this Agreement is reasonable and valid in all respects and irrevocably waives (and irrevocably agrees not to raise) as a defense any issue of reasonableness (including the reasonableness of the activity restrictions, Territory or the duration and scope of this Agreement) in any proceeding to enforce any provision of this Agreement, the intention of the Parties being to provide for the legitimate and reasonable protection of the interests of [Kodiak] and other members of the Company Group.[50]

Kodiak asserts Sections 6 and 8 prohibit Adams from contesting the reasonableness and validity of the RCA. Adams argues a waiver of the right to contest a restrictive covenant's validity violates public policy, as it seeks to avoid the Court's policy-based review of that restrictive covenant.

Neither Adams nor I could find language stating that this Court will consider the enforceability of a noncompete provision even where the employee has stipulated to its reasonableness. Neither Kodiak nor I could find any case explicitly upholding a contractual waiver of the right to contest reasonableness of a noncompete.[51] The Grant Agreements in *FP UC Holdings, LLC v. Hamilton* had

---

[50] RCA §§ 6, 8 (emphasis omitted).

[51] Kodiak offers thin authority in support of enforcing such waiver language in a restrictive covenant agreement. In *Bridgeport Tank Trucks, LLC v. Smith*, the Court shared initial thoughts on the reasonable likelihood of success on the merits in a preliminary injunction analysis. C.A. No. 7935-VCG, at 80 (Del. Ch. Jan. 28, 2013) (TRANSCRIPT) ("So I think with respect to success on the merits, showing a breach of the [noncompete provision in the] agreement and the enforceability—oh, and I should say there was also a contractual obligation not to challenge enforceability, which was also agreed to and supported by consideration."). In *Revolution Retail Systems, LLC v. Sentinel Technologies, Inc.*, the Court considered a seller's agreement that a noncompete provision in a "business-to-

12

such a stipulation, and Vice Chancellor Slights proceeded to consider the three restrictive covenants' reasonableness anyway.[52] Section 10 of those agreements provided:

> Acknowledgments By the Grantee. The Grantee acknowledges that the promises and restrictive covenants that the Grantee is providing in this Agreement are reasonable with respect to period, geographical area and scope and are necessary for the protection of the Business (including the Company's and its Subsidiaries' goodwill).[53]

Vice Chancellor Slights still held the plaintiff to its burden of proving the reasonableness of the covenants and declined to blue pencil the agreements when the plaintiff fell short.[54]

---

business sale of securities" was "reasonable in all respects" and "necessary" to protect each parties' securities and goodwill as evidence that the restrictive covenants were enforceable. 2015 WL 6611601, at *8, *10 (Del. Ch. Oct. 30, 2015). *Revolution* does not stand for the proposition that such language obviates the enforceability analysis, which the Court performed. *Id.* at *10. In *Hills Stores Co. v. Bozic*, the Court found the plaintiffs waived the first *Unocal* prong by "waiv[ing] their right to challenge the validity of" the board's decision to enter into executive compensation agreements—a distinguishable context not laden with the policy considerations surrounding restrictive covenants. 769 A.2d 88, 107 (Del. Ch. 2000). Finally, the Delaware Supreme Court recently found the petitioners agreed to waive their appraisal rights in a stockholder agreement—another distinguishable context. *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1207–08 (Del. 2021).

[52] 2020 WL 1492783, at *3 & n.11.

[53] Plaintiffs' Opening Brief in Support of Their Motion for Preliminary Injunction at Ex. 5, Form of Class P-1 Unit Grant Agreement § 10, *FP UC Hldgs., LLC v. Hamilton*, C.A. No. 2019-1029-JRS (Del. Ch. Feb. 24, 2020), D.I. 64; Plaintiffs' Opening Brief in Support of Their Motion for Preliminary Injunction at Ex. 6, Form of Class P-2 Unit Grant Agreement § 10, *FP UC Hldgs., LLC v. Hamilton*, C.A. No. 2019-1029-JRS (Del. Ch. Feb. 24, 2020), D.I. 64. The Court may take judicial notice of court records. Del. R. Evid. 202(d)(1)(C).

[54] *FP UC Hldgs.*, 2020 WL 1492783, at *8.

Lacking dispositive authority, Kodiak appeals to this Court's contractarian nature, arguing that Adams willingly entered the RCA, agreed to these provisions, and should be held to his bargain.[55] "This contractarian view has its limits when such enforcement is inimical to public policy, however. In certain limited circumstances, our courts will decline to enforce contractual obligations, no matter how clear or sincerely intended when entered."[56] Courts can discount contractual waivers of defenses when public policy demands it.[57]

Public policy requires Delaware courts to evaluate noncompetition and nonsolicitation contracts holistically, carefully, and nonmechanically, with an eye towards reasonableness, equity, and the advancement of legitimate business interests.[58] Sections 6 and 8 purport to waive two of those three standards: whether the RCA's covenants are (i) reasonable and (ii) necessary to protect the legitimate

---

[55] OB at 34–41.

[56] *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114, at *1 (Del. Ch. Jan. 28, 2020).

[57] *See, e.g.*, *Choice Hotels Int'l, Inc. v. Columbus-Hunt Park DR. BNK Invs., L.L.C.*, 2009 WL 3335332, at *8 (Del. Ch. Oct. 15, 2009) ("Similar policy concerns could enable Klein to pursue his defense to the [pledge and security agreement] based on his claim that the [master development agreement] and related agreements are the product of intentional fraud, notwithstanding the alleged waiver."); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1060 (Del. Ch. 2006) ("As § 195 of the Restatement reflects, however, courts have generally refused to go further and allow a contractual waiver of the buyer's right to sue on the basis that a contractually-represented fact was false as a result of the seller's reckless or intentional conduct. Abundant case law to this effect exists." (collecting cases)).

[58] *E.g.*, *Symbiont.io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at *26 (Del. Ch. Aug. 13, 2021); *FP UC Hldgs.*, 2020 WL 1492783, at *6.

business interests of Kodiak and its subsidiaries and affiliates, together defined as the "Company Group."[59]

In my view, an employee's promise not to challenge the reasonableness of his restrictive covenants cannot circumvent this Court's mandate to review those covenants for reasonableness. Even if Adams had not briefed his position that the RCA was unenforceable, I would still have to comply with Delaware law and review the RCA for compliance with public policy before enforcing it with an injunction.[60] This Court does not skip over applying a common law test simply because one party stipulates the test is not necessary.[61]

Further, mechanical submission to an employee's promise not to challenge a restrictive covenant would fly in the face of the public policy that compels review of that covenant. When evaluating enforceability, Delaware courts are tasked with balancing the interests of the public in striking down "artificial obstacles to

---

[59] RCA at Recitals (defining "Company Group"); *id.* §§ 6, 8.

[60] *See Del. Elevator*, 2011 WL 1005181, at *11 (explaining that Delaware law "requir[es] a careful analysis of reasonableness before enforcing a non-compete").

[61] *Supra* notes 52–54 and accompanying text; *see also AM Gen. Hldgs. LLC v. The Renco Grp., Inc.*, 2015 WL 9487922, at *3 (Del. Ch. Dec. 29, 2015) (noting a stipulation to irreparable harm cannot operate to "impair the Court's exercise of its well-established discretionary role in the context of assessing the reasonableness of interim injunctive relief"); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *14 (Del. Ch. May 31, 2022) (rejecting the defendant's argument that a contractual provision in its charter "forecloses judicial review for legal validity and under otherwise applicable equitable standards and requires the court to evaluate the determination under the business judgment rule"), *cert. denied*, 2022 WL 4087800 (Del. Ch. Sept. 7, 2022).

competition,"[62] the interests of people's "natural right to follow any trade or profession anywhere [they] please[] and in any lawful manner,"[63] and the "important interests of commercial enterprises."[64] Delaware law also contemplates denying injunctive enforcement of an overbroad restrictive covenant because of the power dynamic between an employer and employee at the time of signing.[65] Another term

---

[62] *Hammermill Paper Co. v. Palese*, 1983 WL 19786, at *4 (Del. Ch. June 14, 1983) ("A contract designed solely for the purpose of restraining competition and unrelated to any employment agreement between the parties could amount to an illegal restraint on trade. In such circumstances, the public would be injured as a result of the artificial obstacles to open competition. In situations where the interests of the public would be damaged by upholding a post-employment non-competition agreement, the agreement could be deemed invalid under Delaware law." (citing 54 Am. Jur. 2d *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 514 at 961 (1971), and *Knowles-Zeswitz*, 260 A.2d at 175)).

[63] *Faw, Casson & Co.*, 375 A.2d at 468 (internal quotation marks and citations omitted).

[64] *McCann*, 611 A.2d at 3 ("Because the specific enforcement of such covenants involve important interests of commercial enterprises and of individuals seeking to support themselves and their families financially, and because, in that setting, the court is asked to exercise its distinctively equitable powers, each such case requires a careful evaluation of the specific facts and circumstances presented.").

[65] *Del. Elevator*, 2011 WL 1005181, at *11 ("It is trite and naive to suggest that low to mid-level employees freely agree to restrictive covenants. Disparities in resources, bargaining power, and access to information undercut that overly simplistic notion— except for senior managers and top-dog executives where the shoe is on the other foot and different agency concerns arise. The employer is a repeat player with strong incentives to invest in legal services, to devise an advantageous non-compete, and to insist that employees sign. For the employer, the marginal costs of imposing a non-compete are low. For a low-to mid-level employee, the calculus is different. When presented with a non-compete, the employee must hire a lawyer to review the document, then attempt to negotiate its terms. In a competitive environment, the employer may simply look elsewhere. Or in the optimistic days of an initial employment courtship, the employee may simply sign. Later on, if a dispute arises, the employer will be better able to fund the costs of enforcement, including litigation, and can benefit from economies of scale. The departing employee faces not only the costs of litigation, but the difficulties the non-compete creates for a new employer who could be brought into the dispute. The law

in that same contract, by which the employee mouths that the restrictive covenant is reasonable, is subject to those same policy concerns and that same power dynamic. Mechanically enforcing additional language describing the covenants as reasonable would insulate the covenants from judicial review, gutting the work Delaware courts are charged with doing to effectuate the public policy of this State.

I conclude Sections 6 and 8 of the RCA are ineffective to preclude or circumvent the requisite judicial scrutiny of noncompete provisions before they can be enforced. I turn to that well-settled analysis.[66]

### 2. RCA Sections 1 And 2 Do Not Advance A Legitimate Business Interest.

"A non-competition agreement will only be enforced to protect the legitimate economic interests of the employer. Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse."[67] In the context of a sale of a business, the

---

recognizes these concerns by requiring a careful analysis of reasonableness before enforcing a non-compete." (internal citations omitted)). While these concerns are more cogent in an employment agreement than in the sale of a business, they still undergird this Court's reasonableness review of all restrictive covenants.

[66] *See, e.g.*, *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015). Adams does not dispute that the RCA meets the general contract requirements of offer, acceptance, and consideration so, I limit my inquiry to the disputed factors. *Id.*

[67] *Pfuhl*, 1992 WL 345465, at *12.

acquirer has a legitimate economic interest with regard to the assets and information it acquired in the sale.[68]

RCA Sections 1 through 5 enumerate five restrictive covenants.[69]  Sections 1 and 2 provide, in pertinent part:

---

[68] *See, e.g.*, *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009) ("Moreover, if an injunction is not granted, the competition Concord would face from WSP would impair the goodwill Concord purchased in the APA."), *aff'd*, 7 A.3d 486 (Del. 2010); *id.* at *15 ("[A]n injunction would advance Concord's economic interests, as it would give Concord an opportunity to exploit the assets it purchased from WSP . . . ."); *Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*, 1997 WL 458494, at *11 (Del. Ch. Aug. 7, 1997) ("The Non–Competition Agreement is reasonably limited in time, and is also reasonably calculated to protect the value and goodwill of the purchased asset (TeamCare)."); *Pfuhl*, 1992 WL 345465, at *12 ("Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse."); *FP UC Hldgs.*, 2020 WL 1492783, at *7 ("Given the vast geographic scope of the non-compete, Fast Pace must demonstrate it is protecting a particularly strong economic interest to persuade the Court that the non-compete is enforceable."); *cf. Kan-Di-Ki*, 2015 WL 4503210, at *18 ("California law generally does enforce non-competition agreements that were executed in connection with the sale of the goodwill of a business." (citing Cal. Bus. & Prof. Code § 16601)).

[69] RCA §§ 1–5.

<u>Non-Competition</u>. . . . Adams . . . for a period of 30 months beginning on the date hereof (as applicable, the "<u>Restricted Period</u>"), agrees not to . . . anywhere in the states of Idaho and Washington, and within a 100 mile radius of any other location outside of those states in which [Northwest, MCI,] *or any member of the Company Group* have sold products or provided services within the 12 months prior to Closing (the "Territory"), own, manage, operate, control, or participate in the ownership, management, operation or control of, or carry on, be engaged in, permit his, her or its name to be used in connection with, have any financial or other interest in or be otherwise commercially involved in (including as a lender or a donor), *any endeavor, activity or business which is similar to or is in competition with the Business or any part of it, or provide any service to any business or Person engaged in the Business* . . . .

<u>Non-Solicitation</u>. Each of the Covered Parties, during the Restricted Period, agrees not to, . . . directly or indirectly . . . : (c) except on behalf of [Northwest, MCI], [Kodiak] or any other member of the Company Group, induce, canvass, solicit procure or accept the business of, or assist in the inducement, canvassing or soliciting, procurement of or acceptance of the business of, any Person that is or was (i) a customer or client *or prospective client or customer* of [Northwest, MCI], [Kodiak] *or any other member of the Company Group* during the applicable Restricted Period or (ii) a client or customer *or prospective client or customer of the Business* at any time within 12 months prior to the Closing for purposes of providing products or services to such customers that are competitive with the products or services provided by [Northwest, MCI], [Kodiak], *any other member of the Company Group, or the Business as of any such time*.[70]

RCA Section 3 defines "Confidential Information" as:

---

[70] *Id.* §§ 1–2 (emphasis added).

information regarding [Kodiak], [Northwest, MCI], *any other member of the Company Group, the Business* or the Purchased Assets in each case to the extent it is not generally available to the public, including but not limited to, the following: (1) information regarding [Kodiak]'s, [Northwest's, MCI]'s, *any other member of the Company Group's, the Business'[s]* or the Purchased Assets' *operations, assets, liabilities, plans, prospects, affairs or financial condition*; (2) information regarding [Kodiak]'s, [Northwest's, MCI]'s, *any other member of the Company Group's or the Business'[s]* pricing, sales, merchandising, marketing, capital expenditures, costs, joint ventures, business alliances or purchasing; (3) customer lists or other information regarding [Kodiak]'s, [Northwest's, MCI]'s, *any other member of the Company Group's or the Business'[s]* current or prospective customers; (4) information regarding [Kodiak]'s, [Northwest's, MCI]'s, *any other member of the Company Group's or the Business'[s]* vendors, suppliers, distributors or other business partners; (5) forecasts, projections, budgets and business plans regarding [Kodiak], [Northwest, MCI], *any other member of the Company Group or the Business*; (6) [Kodiak]'s, [Northwest's, MCI]'s*, any other member of the Company Group's or the Business'[s]* trade secrets and proprietary information and any of the Purchased Assets constituting the same; and (7) [Kodiak]'s, [Northwest's, MCI]'s, *any other member of the Company Group's or the Business'[s]* website designs, website content, proposed domain names and databases and any Purchased Assets constituting the same.[71]

Importantly, the RCA defines the "Business" as "manufacturing, marketing, selling, distributing, installing and/or delivering of trusses; roof, floor and stair components; framing; siding and other building materials and supplies, and providing services with respect thereto, including design, engineering, turn-key solutions, project management and trade coordination services."[72]  "'Company

---

[71] *Id.* § 3 (emphasis added).

[72] *Id.* at Recitals (defining "Business").

Group' means Kodiak Building Partners Inc., a Delaware corporation, [Kodiak], and each of their respective subsidiaries and Affiliates, all of which are engaged in a competitive industry related to the Business."[73]

When Kodiak purchased Northwest, it purchased Northwest's assets, including its goodwill.[74] As explained, Delaware law recognizes Kodiak has a legitimate economic interest in protecting what it purchased from Northwest, MCI, and their investors, including Adams.

But Kodiak goes further: too far. Kodiak argues that it has a legitimate interest in protecting not only Northwest and MCI's goodwill, but also that of Kodiak, other members of the Company Group, and the Business. Delaware law has not affirmatively recognized a legitimate business interest in protecting all the acquirer's preexisting goodwill that predated the acquirer's purchase of the target. Rather, this Court has explained that a buyer has a legitimate business interest in asking the target's employees to stand down from competing "in the relevant industry" because "[t]he buyer has just paid handsomely for the business and the broad non-compete clears the seller from the competitive space while the buyer

---

[73] *Id.* (defining "Company Group").

[74] SPA § 2.01 (defining "Purchased Assets"); Kodiak Dep. 50 ("Q: So the goodwill that Kodiak purchased in connection with its purchase of Northwest was goodwill in the market served by Northwest, correct? A: Correct."); *id.* at 51 ("Q: But what you purchased from Mr. Adams, his interest in Northwest, is not a component part of the Kodiak Group. It was what Mr. Adams owned in Northwest as a stand-alone company. A: It was."). While the RCA refers to "Purchased Assets," it does not define the term. RCA §§ 3, 7.

strives to make the business he just bought successful."[75]  "[T]he reality is that it is the employer's goodwill in a particular market which is entitled to protection."[76] Restrictive covenants in connection with the sale of a business legitimately protect only the purchased asset's goodwill and competitive space that its employees developed or maintained.[77]  The acquirer's valid concerns about monetizing its purchase do not support restricting the target's employees from competing in other

---

[75] *FP UC Hldgs.*, 2020 WL 1492783, at *7.

[76] *Kan-Di-Ki*, 2015 WL 4503210, at *20 (internal quotation marks omitted) (quoting *Pfuhl*, 1992 WL 345465, at *12).

[77] *Pfuhl*, 1992 WL 345465, at *12 ("Courts have long recognized that an employer has an interest in the goodwill *created by its sales representatives and other employees*, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." (emphasis added) (discussing *Knowles-Zeswitz*, 260 A.2d at 175))); *Knowles-Zeswitz*, 260 A.2d at 175 ("In other words, reasonable protection for an owner of a decentralized business is necessary *because the former employee has had an opportunity to develop economically valuable relationships with his former employer's customers* at least where, as here, enforcement of a covenant not to compete would not harm the public interest." (emphasis added)); *Kan-Di-Ki*, 2015 WL 4503210, at *20 ("'In other words, [DL] safeguarded its investment in [Suer] by ensuring that he could not sell himself directly to a competitor serving [DL clients] and cut out [DL].'  The Restrictive Covenants DL obtained therefore served a legitimate purpose for DL, and by seeking to enforce the terms of those Covenants, DL has not exceeded the scope of that legitimate interest." (quoting *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007))); *Deloitte & Touche USA LLP v. Lamela*, 2005 WL 2810719, at *7 (Del. Ch. Oct. 21, 2005) (finding Deloitte was "likely to succeed in showing that it ha[d] a legitimate business interest in the clients [the former employee defendant] served while employed by Arthur Andersen" because Deloitte had "demonstrated a reasonable probability of being able to show that it had acquired the goodwill the defendant had created with his former clients "when Deloitte agreed to pay tens of millions of dollars to Arthur Andersen to release Arthur Andersen's partners, principals, directors and employees from their restrictive covenants and to obtain licenses for certain intellectual property").

industries in which the acquirer also happened to invest. Kodiak's legitimate economic interest supporting a restrictive covenant binding a Northwest employee and stockholder does not extend to goodwill and competitive space acquired in other transactions with other Company Group members in other industry segments.

Kodiak also seeks to justify the scope of Sections 1 and 2 by pointing to the need to protect all confidential information about the entire "Business" from misuse.[78] As defined, the "Business" includes more services than Northwest offers.[79] Kodiak's representative testified that Adams was only involved with Kodiak's affiliates in the "production lumber and national lumber segments, all of which produce roof trusses in a similar fashion to Northwest."[80] Kodiak disclosed in discovery that only six of the Company Group members, including Northwest, fell into those segments and produced roof trusses.[81]

---

[78] Kodiak has not alleged that Adams breached his confidentiality covenant in Section 3. It alleges only that he attempted to obtain Northwest confidential information after he left. Am. Compl. ¶ 30.

[79] *Compare* RCA at Recitals (defining the "Business"), *with* Kodiak Dep. 5 (explaining Northwest's business).

[80] Kodiak Dep. 10–11.

[81] Kodiak's Second Supplemental Discovery Responses at Response and Supplemental Response #3 (listing American Builders Supply, Inc., Carpenter Contractors of America, Inc., Christensen Lumber, Inc., MCI, Multi-Family Building Products, Inc. d/b/a Direct Lumber & Door, and Northwest as members of the Company Group, among the nineteen members listed, that had locations which "sold, manufactured or delivered any roof trusses . . . during the period from 12 months prior to Closing through the date of [Kodiak's] response"); Kodiak Dep. 11 (listing "Christensen Lumber, Direct Lumber and Door, Carpenter Contractors of America, [and] American Building Supply" as members of the

Kodiak's purchase of Northwest and its assets is separate and apart from its transactions with other members of the Company Group.[82] Kodiak has not identified any confidential information related to its non-truss business lines that it acquired from Northwest or to which Adams had access.[83] Kodiak has not alleged that Adams had any post-Closing relationship with any member of the Company Group except Northwest.[84] At most, Kodiak has demonstrated Adams knew Northwest's confidential information and certain confidential information of a limited number of truss affiliates within the Company Group. I conclude Kodiak lacks a legitimate economic interest to protect confidential information unrelated to truss and lumber operations that would justify restraining Adams's employment.

Company Group who "produce roof trusses in a similar fashion to Northwest" and other Kodiak affiliates with whom Adams had post-Closing involvement); *id.* at 20 ("We have four, call it product categories or platforms that we managed these businesses under. One of them is lumber and building materials, which includes roof trusses. There[] [are] other lumber businesses that do not produce trusses or any other components but are simply lumber distributors. They may do more in hardware and things like that that Northwest or [MCI] might not.").

[82] SPA; RCA at Recitals (defining "Company Group").

[83] Kodiak Dep. 38–39 (testifying that Kodiak's representative did not have any awareness that Adams had "contact with customers of non-truss producing affiliates of Kodiak"); *id.* at 13 (testifying Adams would not have been involved with sales efforts at Kodiak affiliates who did not produce roof trusses); *id.* at 12–13, 64, 66 (testifying any limited access Adams would have had to financial information from non-truss Kodiak affiliates would have only been in monthly meetings with presentations of financial summaries).

[84] OB at 49 ("Indeed, Adams had key relationships with a variety of [Northwest] customers."); *see also* Kodiak Dep. 65 ("Q: And the employees and their contacts, those would be employees of Northwest, correct? A: Primarily employees of Northwest. He also, although he was not employed at [MCI], he had personal direct working relationships with a number of [MCI] employees as well.").

In sum, Kodiak has a legitimate business interest in protecting the goodwill it purchased when it bought Northwest, and the confidential information about Kodiak operations that Adams knows or could access. But the RCA goes beyond those legitimate business interests in restraining Adams from working in or using confidential information for other segments of Kodiak's business it obtained in acquisitions of other companies. Because RCA Sections 1 and 2 cover the entire Business and Company Group, they are overbroad and unenforceable.

### 3. The Scope Of RCA Sections 1 And 2 Is Unreasonable.

The RCA's noncompetition and nonsolicitation covenants are unreasonable in their geographic scope and scope of restricted activities because they are broader than necessary to protect Kodiak's legitimate economic interests. "[T]he reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect."[85] If an "employee would *gain from the[ir] employment* some advantage in any part of th[eir employer's] market," then the employer target and the acquirer may enter into an enforceable contract prohibiting the employee "from soliciting *those* customers on behalf of a competitor regardless

---

[85] *Weichert Co. of Pa. v. Young*, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007); *accord Pfuhl*, 1992 WL 345465, at *12 ("While most judicial opinions regarding the reasonableness of the geographic extent of employee non-competition agreements speak in terms of physical distances, the reality is that it is the employer's goodwill in a particular market which is entitled to protection.").

25

of their geographic location."[86] While Delaware courts allow for a broader scope of reasonableness in connection with a sale of a business as opposed to an employment agreement,[87] "reasonableness" is still tied to whether the scope is "essential for the protection of the [acquirer's] economic interests."[88]

While Adams does not challenge the RCA's temporal duration, he contends the RCA's geographic scope is unreasonably broad.[89] The RCA draws radii around each business in the Company Group, prohibiting Adams from competing "anywhere in the states of Idaho and Washington, and within a 100 mile radius of any other location outside of those states in which [Northwest, MCI] or any member of the Company Group have sold products or provided services within the 12 months prior to Closing."[90] He is also prohibited from soliciting customers from "any other member of the Company Group . . . for purposes of providing products or services to such customers that are competitive with the products or services provided by

---

[86] *Kan-Di-Ki*, 2015 WL 4503210, at *20 (internal quotation marks omitted) (emphasis added) (quoting *Pfuhl*, 1992 WL 345465, at *12).

[87] *FP UC Hldgs.*, 2020 WL 1492783, at *7 ("These broader restrictions make sense following the sale of a business.").

[88] *Id.* at *6 (internal quotation marks omitted) (quoting *Norton*, 1998 WL 118198, at *3); *see also Kan-Di-Ki*, 2015 WL 4503210, at *20 ("[T]he reality is that it is the employer's goodwill in a particular market which is entitled to protection." (internal quotation marks omitted) (quoting *Pfuhl*, 1992 WL 345465, at *12)).

[89] AB at 26–30.

[90] RCA § 1.

[Northwest, MCI], [Kodiak], any other member of the Company Group, or the Business as of any such time."[91] These provisions are geographically overbroad.

As discussed, Kodiak's legitimate economic interest that can support restraining Adams's employment is only in the goodwill and competitive space it purchased from Northwest in the market Northwest serves.[92] Further, Kodiak alleged only that Adams had business relationships with Northwest's customers.[93] The noncompete provision is overbroad to the extent it prohibits competition in geographic areas around subsidiaries other than Northwest, and the nonsolicit provision is overbroad to the extent it covers customers, clients, or prospective customers and clients of subsidiaries other than Northwest.[94] Kodiak has failed to demonstrate that the RCA's geographic scope is essential to the protection of its legitimate interests in Northwest.

The scope of restricted activities in the RCA's noncompetition covenant is also unreasonable. Section 1 prohibits Adams from

---

[91] *Id.* § 2.

[92] Kodiak Dep. 50–51.

[93] OB at 49; *see also* Kodiak Dep. 32 ("Q: . . . Did Mr. Adams ever work for [MCI]? A: I do not believe he was an employee of [MCI]."); Leslie Dep. 56 (testifying "to the best of [his] knowledge" Adams did not "have any affiliation or responsibility with respect to [MCI]").

[94] Kodiak Dep. 50–51 (testifying Kodiak purchased Northwest's goodwill in Northwest's market); *Vitalink*, 1997 WL 458494, at *11.

> own[ing], manag[ing], operat[ing], control[ing], or participat[ing] in the ownership, management, operation or control of, or carry[ing] on, be[ing] engaged in, permit[ing] his, her or its name to be used in connection with, hav[ing] any financial or other interest in or be[ing] otherwise commercially involved in (including as a lender or a donor), any endeavor, activity or business which is similar to or is in competition with the Business or any part of it, or provide any service to any business or Person engaged in the Business . . . .[95]

As defined by the RCA, the "Business" encompasses more than just Northwest's industry segment of roof trusses.[96] It also includes "manufacturing, marketing, selling, distributing, installing and/or delivering . . . floor and stair components; framing; siding and other building materials and supplies, and providing services with respect thereto, including design, engineering, turn-key solutions, project management and trade coordination services."[97] Prohibiting Adams from engaging in "any activity or business which is similar to" or competes with "the Business" is unreasonable because the noncompetition provision is broader than necessary to protect the goodwill Kodiak purchased from Northwest.

### 4. The Balance Of The Equities Favors Adams.

This Court effectively considers the equities of a restrictive covenant on a preliminary injunction twice: first here, when considering whether the covenant is

---

[95] RCA § 1.

[96] *Compare id.* at Recitals (defining the "Business"), *with* Kodiak Dep. 5 (explaining Northwest's business).

[97] RCA at Recitals (defining the "Business").

enforceable, and then again when considering whether to enjoin an employee under an enforceable covenant.[98] "In deciding whether to specifically enforce a restraint on future competition, this Court must carefully balance the legitimate interests of the parties and of the public."[99] A court of equity will not enforce restrictive covenants "if, on balance, to do so would impose an unusual hardship on a former employee."[100] This Court "will not enforce a covenant that is more restrictive than [the company's] legitimate interests justify or that is oppressive to [the employee]."[101] "This same balancing, while present, is far less important where the covenant not to compete is part of a contract for the sale of a business, rather than an employment contract."[102]

---

[98] *E.g.*, *FP UC Hldgs.*, 2020 WL 1492783, at *5 ("To earn a preliminary injunction, a plaintiff must demonstrate: (1) a reasonable probability of success on the merits, (2) that absent preliminary injunctive relief, it faces imminent and irreparable injury and (3) that such harm outweighs the harm that may result from the injunction, should it prove to have been improvidently granted." (citing *C & J Energy*, 107 A.3d at 1066)); *id.* at *6 ("Delaware courts do not 'mechanically' enforce non-competes. Instead, our courts carefully review the covenants to assure they '(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities.'" (quoting *Wilson*, 2018 WL 4677606, at *5)).

[99] *Vitalink*, 1997 WL 458494, at *11.

[100] *Norton*, 1998 WL 118198, at * 3.

[101] *Id.*

[102] *Gamble v. Walker*, 1994 WL 384617, at *3 n.1 (Del. Ch. July 18, 1994) (citing RESTATEMENT (FIRST) OF CONTRACTS § 515 cmt. b (Am. L. Inst. 1932)).

Kodiak argues the equities weigh in its favor. First, Kodiak asserts that Adams should be held to the contract for which it bargained, and into which Adams willingly entered. Kodiak alleges Adams's position as one of Kodiak's general managers qualifies him as a "sophisticated" "senior executive" who should be held to his bargain.[103] Further, in connection with the Acquisition, Adams received "[a]pproximately [$]900,000" in exchange for his Northwest interests, which Kodiak characterizes as approximately seven times Adams's annual compensation at the time.[104] This is more than "token consideration."[105] Second, Kodiak contends the circumstances under which Adams searched for, and found, his post-Northwest employment, weigh against him. Following his resignation from Northwest, Adams

---

[103] I note that the only facts that Kodiak alleges in support of its contention that Adams was a "sophisticated" "senior executive," who should be held to a higher standard than if he were "unsophisticated," is that Adams was "second in charge at Northwest," and one of four stockholders. Adams Dep. 38, 45; *cf. Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch. 2001) (noting the different circumstances in which "sophisticated parties, assisted by industry consultants and experienced legal counsel" might "allocate[] their risks and obligations" in a contract as contrasted with "unsophisticated parties" who might need "protection"); *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *22 & n.227 (Del. Ch. Mar. 9, 2022) (finding the plaintiff to be an "unsophisticated businessman" even though "he had built a large waste business" and "sold other parts of this business before"). Kodiak has not alleged that Adams was personally represented by counsel in connection with the Acquisition or the RCA.

[104] Adams Dep. 361–62; OB at 1, 37; RB at 15, 18, 21–22.

[105] *FP UC Hldgs.*, 2020 WL 1492783, at *7–8 (finding the noncompetition covenant "likely overbroad as a matter of Delaware law" after also determining the record lacked any evidence that the employee "received substantial consideration" in exchange for his agreement not to compete, and instead raised a concern he received "token consideration").

30

considered employment as a "boat captain," but opted not to pursue it.[106]  Instead, Adams went to work for BFS, manufacturing and selling roof trusses approximately twenty-four miles away from Northwest.[107]

In spite of all of that, the RCA is more restrictive than Kodiak's legitimate interests justify.  It would be inequitable to enforce such unreasonable covenants against Adams.[108]

### B.     Kodiak Has Not Shown That It Will Suffer Irreparable Harm In The Absence Of A Preliminary Injunction.

Having found Kodiak is not reasonably likely to succeed on the merits of Counts I and II because the underlying restrictive covenants are not enforceable, I do not reach the other elements of the preliminary injunction test for those Counts. For Kodiak to obtain a preliminary injunction, Counts III and IV must anchor the essential irreparable harm element of the preliminary injunction test.[109]  Count III alleges Adams breached RCA Section 9 "by failing to provide the contractually

---

[106] Adams Dep. 50–54.

[107] *Id.* at 67.

[108] *Vitalink*, 1997 WL 458494, at *11.  The inequities inherent in blue-penciling a noncompete also counsel against enforcing only those portions of the RCA that are supported by Kodiak's legitimate business interests, even as Adams appears to have violated those portions. *See supra* note 49.

[109] Adams does not dispute that the RCA imposes at least some valid contractual obligations.  In his Amended Answer to the Verified Amended Complaint, "Adams admit[ted] that he did not provide notice to Kodiak prior to commencing work at BFS" under Section 9.  Am. Ans. ¶¶ 6, 61.

required notice prior to commencing work at BFS,"[110] and Count IV alleges only that "Adams has breached the [RCA]."[111] Those Counts seek only damages.[112]

Kodiak argues that Adams agreed that a breach of RCA Sections 1 through 5 constitutes irreparable damage,[113] but Counts III and IV do not allege breaches of those sections. Kodiak has not alleged that any damages would be unquantifiable.[114] Kodiak's counts that may present a reasonable likelihood of success on the merits "simply do[] not support imminent, non-speculative damages that can be stemmed only by *preliminary injunctive* relief."[115] Kodiak has failed to carry its burden to show that it faces a threat of irreparable harm in the absence of a preliminary injunction.

\* \* \* \* \*

---

[110] Am. Compl. ¶ 61. RCA Section 9 provides: "Each Covered Party agrees that during such Covered Party's Restricted Period, such Covered Party will give notice to [Kodiak] of each new material business activity such Covered Party plans to undertake that is related to the Business, at least 30 days prior to beginning any such activity." RCA § 9.

[111] Am. Compl. ¶ 66.

[112] *Id.* ¶¶ 62, 67.

[113] OB at 53–54 (quoting RCA § 6).

[114] *Alpha Builders*, 2004 WL 2694917, at \*5.

[115] *Cantor Fitzgerald*, 724 A.2d at 586.

Kodiak has not satisfied the standard to earn a preliminary injunction. Consequently, I need not address the third preliminary injunction element, the balance of the equities.[116]

## III. CONCLUSION

Kodiak's Motion for Preliminary Injunction is **DENIED**.

---

[116] *See In re New Maurice J. Moyer Acad., Inc.*, 108 A.3d 294, 325–26 (Del. Ch. 2015) (citing *Cantor Fitzgerald*, 724 A.2d at 579).